IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN M. KUMP, | ) | CASE NO.  1:14CV2384 |
| o/b/o N.K.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 13).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security  (the "Commissioner") denying Kathleen Kump's ("Plaintiff") application for

Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C.

§1381 *et seq*., on behalf of her minor child, N.K.D., is supported by substantial evidence and

therefore conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and

REMANDS the case back to the Social Security Administration.

## I.  INTRODUCTION & PROCEDURAL HISTORY

On September 19, 2011, Plaintiff applied for Supplemental Security Income benefits on

behalf of N.K.D. (Tr. 134).  Plaintiff alleged N.K.D. had been disabled since his birth on July 10,

2004, due to vision issues including numerous eye surgeries, hearing issues, asthma, poor motor

skills, and abnormal development of the skin, hair, nails, teeth and sweat glands. (Tr. 166, 274).

N.K.D.'s application was denied initially and upon reconsideration.  (Tr. 91, 95).

1

A request for a hearing was timely filed, and a hearing was held on July 23, 2013 before Administrative Law Judge ("ALJ") Frederick Andreas to evaluate the application. (Tr. 274). Plaintiff and N.K.D., along with counsel, appeared before the ALJ and testified. (Tr. 36-63). On August 9, 2013, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 13-28).

Subsequently, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 10). The Appeals Council denied Plaintiff's request, thereby making the ALJ's August 9, 2013, decision the final decision of the Commissioner. (Tr. 1). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

## II.  EVIDENCE

A. Personal Background Information

N.K.D. was born on July 10, 2004, making him 9-years-old on the day of the hearing. (Tr. 134). N.K.D. had completed third grade and was moving into fourth grade. (Tr. 41). Accordingly, when the ALJ rendered his decision, N.K.D. was an "school-age" child for social security purposes. *See* 20 C.F.R. 416.926a(g)(2)(iv). N.K.D. testified that he enjoyed swimming in the summer months and visited his uncle's house once a week to swim in his pool. (Tr. 40).

Plaintiff testified at the hearing regarding N.K.D.'s medical and behavioral background and current condition. She testified that N.K.D.'s eyes started crossing around six months old, and that his six surgeries have not been wholly successful. (Tr. 44-45). Plaintiff stated more surgeries are possible, and that he continued to have misalignment and vision problems. *Id.* Plaintiff testified that N.K.D. is missing teeth resulting in speech difficulties, for which he is currently in speech therapy fifteen minutes a week. (Tr. 47, 62). While Plaintiff testified that N.K.D. did not have ear infections, she explained doctors discovered a white, glue-like substance

that blocked his hearing, had tubes inserted (one of which still remained after three or four years and may require surgical removal), and had his adenoids and tonsils removed to help with snoring problems, but without lasting results.  (Tr. 47).  She further testified N.K.D. often overheats during physical activity because he does not sweat.  (Tr. 50-51).

Regarding his education, Plaintiff testified that N.K.D. had improved somewhat in his learning and was not suspended during his third grade year.  (Tr. 48, 61).  However, she stated he still exhibited significant problems with focus and attention, as well as below average fine motor skills that impacted his school work.  (Tr. 48).  She further explained that his ADHD symptoms are not well-controlled, and that he goes from one activity to the next after three to five minutes, but will play video games for an hour.  (Tr. 51-52).  According to Plaintiff, N.K.D. reacted violently when frustrated, physically punched his family as well as objects, and threatened others with knives.  (Tr. 52-53).  Plaintiff testified counseling efforts failed to improve N.K.D's behavior and that he had a bad reaction to past medication, but that he showed some improvement in his ability to focus on his current medication, despite difficulties in medication administration.  (Tr. 53, 57-58, 62).  Further, Plaintiff testified N.K.D. just started bathing himself but she was still required to assist him, and that he did not properly use the bathroom. (Tr. 49-50, 62).

B. Medical records

  1.  Physical Impairments

Originally seen in a pediatric genetics department in December 2008, notes from a follow-up visit on January 20, 2009 documented a gene mutation analysis did not show any gene mutation.  Despite this, medical records stated N.K.D. would be treated as having ectodermal dysplasia, and recorded a diagnosis of mild ectodermal dysplasia.  (Tr. 378-79).  N.K.D. was

indicated to have some missing and misshapen teeth, slow growing hair and nails, chronic cough, dry skin, and minimal sweating. (Tr. 378).  The report, which referred to Plaintiff as a "good historian," noted that N.K.D. was in the 90th percentile for both height and weight, but had speech mis-articulations and that Plaintiff had concerns about his hearing.  (Tr. 378).

Speech and Language Evaluation notes, dated December 22, 2008, reported a history of frequent and chronic ear infections, and indicated possible hearing loss that might be negatively affecting his speech and language abilities.  (Tr. 373-74). He received a standard score of 78 on the GFTA-2 which puts him over 1 standard deviation below the normal range regarding his phonemic development.  (Tr. 374).  N.K.D.'s auditory comprehension was within normal limits, but it was recommended that N.K.D. receive further audiological evaluation.  (Tr. 374-75).  In summary, the evaluator concluded N.K.D. exhibited moderate-severe articulation delay, reduced intelligibility at the conversational level, mild expressive language disorder, mild hyponasality and increased rate of speech, but pragmatic and behavioral skills within normal limits.  (Tr. 375).

An audiologic evaluation was conducted on January 9, 2009 by Julie A. Bonko, an audiologist.  (Tr. 367).  Because N.K.D. was "too active and fearful for evaluation with insert ear phones," the examiner used soundfield testing.  Test results showed mild conductive hearing loss "in at least the better ear," with middle ear effusion in the left ear and probable middle ear effusion in the right ear.

A follow-up office visit report indicated N.K.D. underwent an adeno-tonsillectomy and bilateral VT insertion prior to March 17, 2009.  (Tr. 359).  A surgical pathology report, dated February 2009, further indicated N.K.D. previously underwent a myringtotomy.  (Tr. 386).  The March 17th follow-up notes reported N.K.D. exhibited normal hearing sensitivity, excellent word recognition, and that his snoring had improved significantly.  (356, 359-60).

Medical records indicated N.K.D. had eye surgery at 9 months for intermittent esotropia, but still has some strabismus.  (Tr. 373, 378).  An office visit report showed N.K.D. presented to Dr. Ying Qian, Opthamology Resident, on March 11, 2008, with Plaintiff complaining that N.K.D. exhibited a "wandering eye" for the past six to eight weeks.  After examination, Dr. Qian diagnosed N.K.D. with monocular exotrophia, which was confirmed by Dr. Annable.  (Tr. 382).  On March 28, 2011, N.K.D. had a fourth surgery on both eyes to correct vertical deviations. (Tr. 289-90, 308, 398-99).  Post-operative notes reported that his eyes were overcorrected in every surgery, resulting in this surgery taking a very conservative approach.  (Tr. 308).  Plaintiff's report and examination indicated a "big improvement" at near, but still exhibited issues at distance.  (Tr. 308).  The examining doctor noted that it was unclear whether his eye muscle surgery complications were related to his history of congenital ectodermal dysplasia.  (Tr. 308).  Records indicated N.K.D. has had a total of six surgeries on his eyes (with some history of complications and over-correction), with the most recent, performed on both eyes, on January 16, 2012, cutting and resowing the muscles in order to align N.K.D.'s eyes.  (Tr. 308-09, 312, 428-29, 455-56).  As of March 2013, N.K.D. continued to have ongoing mis-alignment of the eyes, and records from May and June 2013 reported continuing vision problems.  (Tr. 275, 592-93, 606, 611, 614).

On August 26, 2012, Plaintiff took N.K.D. to the emergency room for what appeared to be an adverse reaction to his ADHD medication, Concerta, which he started that day.  N.K.D. exhibited rapid heartbeat, increased hyperactivity, teeth grinding and lip smacking, and tics. (Tr. 586).  Hospital staff administered Benedryl, which N.K.D. spit onto the floor.  (Tr. 590).  N.K.D. was diagnosed with tardive dyskinesia, purportedly induced by an allergic reaction.  (Tr. 585,

590).  Records from May and June of 2013 indicated N.K.D. discontinued Concerta, was taking Intuniv for his behavior, but that it wore off in the afternoons.  (Tr. 593-94).

Consultative Examiners

James T. Liang, M.D., a board certified pediatrician, performed a consultative examination on November 22, 2011, at the request of the state agency.  The report stated that N.K.D. had very thin nails, and that, while doctors suspected ectodermal dysplasia, the condition could not be diagnosed.  (Tr. 413).  The report stated N.K.D. cannot sweat, but had no frequent diarrhea, vomiting, or ear infections.  (Tr. 413-14).  The report indicated abnormal extraocular movements, specifically that the left eye turns out and the right eye turns in.  (Tr. 413).  Speech was noted as normal, sustained, and understandable, and the examiner mentioned that N.K.D. was hyperactive but that "the teacher doesn't complain."  *Id.*  N.K.D. was noted to be "alert and cooperative," with normal gross motor and fine motor skills.  (Tr. 414).  Further, notes referred to his previous surgeries, including six eye surgeries, and the examiner stated there was still some misalignment in his eyes, which would require more surgery.  (Tr. 413-14).

On August 2, 2012, Dr. Harvey Lester conducted an opthalmological/optometric consultative examination.  Dr. Lester determined N.K.D. could see distance at 20/50 for his right eye and 20/40 for his left, and could read at 20/20 in both eyes.  (Tr. 464).  However, Dr. Lester found abnormal muscle function, described as intermittent exotropia, cup/ disc ratio .5.  (Tr. 464).  Cooperation was documented as good, with visual fields plotted within normal range, and Dr. Lester diagnosed N.K.D. with strabismus in both the right and left eyes.  (Tr. 465).

2.  Mental Impairments

An exam report from a medical examination relating to his ectodermal dysplasia, dated January 20, 2009, noted N.K.D. as very active, difficult to understand, and strong-willed.  (Tr.

378).  Prior to the hearing, on January 30, 2013, Plaintiff took N.K.D. to Applewood Centers to address ongoing aggressive behaviors at home, specifically anger, hitting, and yelling and screaming.  (Tr. 627-35).  The report also stated N.K.D. talked about killing himself, and exhibited decreased frustration tolerance, impaired judgment, and impaired interpersonal boundaries.  (Tr. 629, 631).  The Applewood assessment indicated that, while he exhibited these behaviors daily at home, it did not seem to interfere with school, although he was disruptive in class.  (Tr. 627, 629).  However, evaluation reports from June 2013 stated he continued to have trouble sitting still and paying attention in school, and an Individualized Service Plan dated February 15, 2013, stated N.K.D. exhibited disruptive behaviors, throws chairs, and was suspended.  (Tr. 605, 624).

<u>Consultative Examiners</u>

Michael Faust, Ph.D., performed a psychological consultative examination on December 5, 2011, at the request of the state agency.  (Tr. 416).  Notes indicated a reported history of difficulties with attention deficit issues, but that N.K.D. had never been suspended, was not defiant with teachers, and earned good grades.  (Tr. 417).  Dr. Faust observed N.K.D. as putting forth good effort but was hyperactive and impulsive, quite distracted, and difficult to keep on task.  (Tr. 418-19).  N.K.D. was further noted to exhibit poor fine motor skills for his age and difficulty with his eyes being crossed, but had no difficulty hearing.  (Tr. 418).  Dr. Faust reported significant speech problems that indicated phonological disorders but no receptive or expression language disorders.  (Tr. 418-19).  Further, his report stated N.K.D. can complete self-care activities with structure and direction, and is independent in toileting.  (Tr. 422).  Dr. Faust assigned N.K.D. a GAF score of 60, "implying moderate symptoms and impairment in daily functioning."  (Tr. 420).

The state agency requested another psychological consultative examination on April 6, 2012, by Matthew Paris, Psy.D.  (Tr. 435).  Dr. Paris reviewed the consultative examination of Dr. Faust, and conducted a clinical interview with Plaintiff and N.K.D.  (Tr. 435).  Dr. Paris noted N.K.D. was irritable and difficult to interact with, and, although he exhibited average intelligence, his judgment was "fair to limited" due to his behavior problems, impulsivity, and hyperactivity.  (Tr. 438-39).  Evaluation notes indicated Plaintiff reported N.K.D. will run into the street without checking for cars, and he has made statements of wanting to kill himself, although currently exhibited no suicidal ideation. (Tr. 436-38).  Based on his examination, Dr. Paris diagnosed N.K.D. with Attention Deficit Hyperactivity Disorder, Combined Type, Generalized Anxiety Disorder, Oppositional Defiant Disorder, and Developmental Coordination Disorder – fine motor skills.  (Tr. 440-41).  At that time, Dr. Paris assigned a GAF of 41, much lower than previously determined by Dr. Faust during his evaluation five months earlier.  (Tr. 441).

## C.  Educational Records

A teacher questionnaire dated October 10, 2011 was completed by N.K.D's first grade teacher, Danielle Kay (at the time of completion, N.K.D. had moved on to second grade).  (Tr. 174-182.).  Ms. Kay stated she had known N.K.D. for a year and saw him on school days, Monday through Friday.  (Tr. 175).  In the domain of Acquiring and Using Information, Ms. Kay found one serious problem (understanding and participating in class discussions), four obvious problems, and five slight problems.  (Tr. 176).  In the domain of Attending and Completing Tasks, she found two serious problems (carrying out single- and multi-step instructions), two obvious problems, and five slight problems.  (Tr. 177).  The questionnaire indicated only two slight problems in the domain of Interacting and Relating to Others, and no problems in the other

designated categories.  (Tr. 178).  Ms. Kay found no problems in the domains of Moving and Manipulating Objects and Caring for Himself.  (Tr. 179-80).  Notes included in this questionnaire indicated Ms. Kay's observations that N.K.D. has a hard time staying on task, is easily distracted, and difficulty understanding oral directions due to ear infections.  (Tr. 176-78, 181).

N.K.D.'s second grade teacher, Christa Ludwig, completed a teacher questionnaire dated March 6, 2012.  Ms. Ludwig indicated that N.K.D. was in second grade at the time she completed the questionnaire, that she had known him for six months, and saw him five days a week for six and one-half hours.  (Tr. 217).  In the domain of Acquiring and Using Information, Ms. Ludwig found, along with three obvious problems and two slight problems, four serious problems in comprehending oral instructions, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions.  (Tr. 218).  She further noted that he did not participate in class discussions, and had difficulty following directions and staying on task.  (Tr. 218).  In the domain of Attending and Completing Tasks, Ms. Ludwig did not find any serious problems, but found five obvious problems and three slight problems, but additionally noted the N.K.D. struggled to follow directions and submitted very sloppy work.  (Tr. 219).  In the domain of Interacting and Relating with Others, Ms. Ludwig found N.K.D. exhibited serious problems in three areas, specifically in relating experiences and telling stories, interpreting meanings of facial expressions and body language, and using adequate vocabulary and grammar to express thoughts and ideas in everyday conversation.  (Tr. 220).  Additionally, she found obvious problems in two categories under this domain, and slight problems in two categories, noting N.K.D. struggled to relate stories and hold conversations with adults.  (Tr.

9

220).  In the domain of Moving About and Manipulating Objects, Ms. Ludwig did not find any serious problems, but did find obvious or slight problems in most categories, and noted he had very low fine motor skills.  (Tr. 221).  Ms. Ludwig found some obvious or slight problems in the domain of Caring for Himself, but did not provide any written explanation in support of these findings.  (Tr. 222).

Reports indicated, despite his behavioral issues and physical limitations, N.K.D. tried hard in school and was making good progress as of October 14, 2011.  (Tr. 199).  His first grade Iowa Testing, administered in February 2011, showed generally below average scores, although N.K.D. maintained As and Bs on his report card.  (Tr. 202-03, 225, 241).  His second grade report card also showed mostly As and Bs, but with his grades in reading and English falling to Cs and Ds in the third and fourth quarters.  (Tr. 238).  The Applewood assessment performed in January 2013 showed N.K.D. maintained a B average in third grade, and that the majority of his behavior problems were exhibited at home, rather than school.  (Tr. 629-30).  However, the Individualized Service Plan mentioned "suspended" under presenting problems.  (Tr. 624).

### III.  SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The minor claimant, [N.K.D.] has been considered to be a school-age child, that is a child age six to the attainment of age 12, ever since September 9, 2011 when the above-mentioned application for supplemental security income was protectively filed on his behalf.

2.  The claimant has never engaged in any disqualifying substantial gainful activity.

3.  The claimant has had the following "severe" medical impairments since September 9, 2011 when the above-mentioned application for supplemental security income was protectively filed on his behalf:  asthma, a communication impairment/phonological disorder, a developmental coordination disorder involving the claimant's fine motor skills, attention deficit hyperactivity disorder, and oppositional defiant disorder/disruptive behavior disorder.

4.  Since September 9, 2011 when the above-mentioned application for supplemental security income was protectively filed on the claimant's behalf, the claimant has not had an impairment, or combination of impairments, that has met or medically equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

5.  Since September 9, 2011 when the above-mentioned application for supplemental security income was protectively filed on his behalf, the claimant has not had an impairment, or a combination of impairments, that has functionally equaled the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

6.  The minor claimant. [N.K.D.], has not been disabled, as defined in the Social Security Act, at any time since September 9, 2011 when the above-mentioned application for supplemental security income was protectively filed on his behalf.

(Tr. 16-28) (internal citations omitted).

## IV.  STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be

given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id.* The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner,* 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.,* 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

Plaintiff maintains that the ALJ incorrectly concluded N.K.D. did not meet or functionally equal a listed impairment, arguing that he improperly discredited N.K.D.'s teachers and mother, and should have utilized a Medical Expert at the hearing.

A. Teacher Reports

The regulations instruct the ALJ to consider information from the child claimant's teachers when assessing the severity of the child's impairments. 20 C.F.R. § 416.924a(a)(2)(iii). Social Security Ruling ("SSR") 06-03p explains how the Commissioner should address opinions from teachers, who are not "acceptable medical sources," but rather, are deemed "other sources." SSR 06-3p, 2006 WL 2329939, at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. *Id.*; *see Cruse v. Comm'r Soc. Sec.,* 502 F.3d 532 (6th Cir. 2007).

In regard to analyzing opinions from "other sources," SSR 06-3p explains that:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a

> claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6.  The Ruling also sets out factors to be considered when evaluating opinion evidence from medical sources that are not acceptable medical sources. *Id.* at *4-5. These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, specialization, and how well the source explains the opinion.  *Id.*  The text of the SSR 06-3p is merely advisory.  Indeed, "SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'" *Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio Jan. 30, 2012).

The ALJ states he gave "great weight" to state agency consultants, and considered "all the relevant evidence" which included information from school teachers, and made a generalized statement that the evidence does not support a finding of a "marked" limitation in any two areas, or an "extreme" limitation in any one area.  (Tr. 18-19).  Under most domains, the ALJ states his conclusions are based on a myriad of evidence, citing only the source and pointing to page numbers within the transcript, and including "some of the information found in a report prepared by one of the claimant's teachers," or later, by a "different teacher."  (Tr. 20, 23, 25-26, 28). Under one domain, "Acquiring and Using Information," the ALJ also discredits the opinion of a different teacher who found N.K.D. had "serious" problems acquiring and using information, as being inconsistent with the grades received by N.K.D., and as not supported by the evidence. (Tr. 20-21).  Under the domain "Attending and Completing Tasks," the ALJ does not specifically mention teacher reports, although he does reference the teacher reports by page number only (with many other page numbers in a string citation) to support the conclusory statement that "the

evidence in this case shows that the claimant's impairments have caused a 'marked' limitation on this area of functioning."  (Tr. 22).

Exemplified by the ALJ's teacher questionnaire analysis, Plaintiff's assignments of error underscore a greater insufficiency that permeates the entire ALJ decision.  An ALJ is required to provide an adequate explanation of the evidence in support of his findings, such that the claimant and reviewer can follow his reasoning and understand how the ALJ reached his conclusions. *See Reynolds v. Comm'r of Soc. Sec., 424 Fed. Appx. 411, 414 (6th Cir. 2011).  Reynolds* explained:

> [A]n ALJ must include a discussion of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. 557(c)(3)(A).  The reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review.

*Id*.  Previous cases have found that non-specific cites to exhibits are insufficient to show the "reasons or basis" for an ALJ's findings where the evidence could also support a different conclusion.  *See Burbridge v. Comm'r of Soc. Sec., 572 Fed. Appx. 412, 416 (6th Cir. 2014)* (finding general cite to exhibit number insufficient where exhibit contained support for different conclusion as to material issue).  The *Burbridge* court explained, "[u]nder these circumstances, a statement of 'the reasons or basis' for the material finding would include a statement of which portions of the exhibit the ALJ relied on and why they supported a finding…." *Id*. (*citing Reynolds, 424 F. App'x at 414*).

In the present case, the ALJ purports to support his conclusions by citing to evidence in the record from various sources; however, the Court cannot ignore that the ALJ failed to specify what information contained in these records he uses (or rejects) in support of his findings.  The

ALJ's decision provides little more than exhibit numbers and page numbers in support of generalized findings under rote standards. Review of some of these cited documents show some evidence that is inconsistent with other evidence, and that could be considered inconsistent with the conclusions of the ALJ, such as ongoing eye and vision issues, reports of suicidal ideations, self-care limitations, ongoing and potentially increasing behavioral issues at home and at school, and inconsistent evaluations within a five to sixth month period between state agency consultants.  (Tr. 49-50, 62, 189, 208, 223, 413-14, 418, 422, 438, 440-41, 591-93, 598-99, 611, 613-14, 622-635).

Regarding the teacher questionnaire analysis, the ALJ considered the teacher questionnaires, but does not adequately explain what information was considered and/or discounted from those reports.  With the exception of the reference to N.K.D.'s grades, the decision does not provide reasons for the ALJ's findings regarding the teachers' opinions, or any evidence that the relevant factors were considered during the analysis.  Review of these questionnaires shows evidence that is not necessarily consistent with the conclusions of the medical consultants and the ALJ, such as reports of serious problems in half the sub-categories under the Acquiring and Using Information domain, serious daily problems in other domains, minimal fine motor skills, and reports of ongoing struggles in school work completion, maintaining attention, interacting with others, and using good judgment regarding personal safety.  (Tr. 176-78, 219-22).  Citations only to exhibit numbers and page numbers to show that "some of the information" supports his conclusions fails to properly inform the Court how he actually arrived at these conclusions. As such, the Court is unable to conduct a meaningful review of the teacher questionnaire analysis.

Accordingly, remand is necessary because the Court is unable to determine whether the ALJ's conclusions are supported by substantial evidence.  It is not clear what information within the teacher reports the ALJ uses in support of his conclusions, or why other information was discounted, if considered at all.  This deficit persists throughout the decision regarding the ALJ's discussion of other evidence, from both medical and non-medical sources, including hearing testimony (as discussed in the next section).  In sum, the decision does not allow the Court to follow the ALJ's reasoning with regard to the evidence, including the teachers' opinions.  Thus, the Court is unable to conduct a meaningful review, and remand is warranted so that the ALJ may provide a more thorough analysis.[1]

B.  The ALJ's Credibility Analysis

Plaintiff asserts that the ALJ did not provide adequate grounds for discrediting her own testimony regarding N.K.D.  It is the ALJ's responsibility to make decisions regarding the credibility of witnesses.  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).  Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th 2007).

This circuit follows a two-step process in the evaluation of a claimant's subjective complaints of the severity of symptoms. 20 C.F.R. §§ 416.929(a), 404.1529(a); *Rogers*, 486 F.3d

---

[1] A full review and analysis may not result in a disability finding, but without a meaningful explanation, this possibility cannot be conclusively determined.  However, this decision should not be construed as an advisory opinion in favor of a finding of disability on remand.

at 247; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853-54 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994). First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247. Second, if such impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.* The ALJ should consider the following factors in evaluating the claimant's symptoms: the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186 (July 2, 1996).

In the present case, the ALJ's discussion of the evidence he relied on to formulate his decision is again insufficient for the Court to determine the ALJ's reasoning regarding his analysis of Plaintiff's testimony and credibility, due to the same shortcomings described in the previous section. With regard to the mother's credibility, the ALJ cites only generally to "some information provided by claimant's mother" including her testimony at the hearing, in support of his findings. (Tr. 20). While he does cite, by way of example, to some page numbers that supposedly include the information he considered in support of his findings, nowhere in the decision does the ALJ specify what evidence from these pages he considered in support, and what evidence was discredited. Because the ALJ did not adequately articulate the basis for his analysis, this Court is again unable to determine whether his consideration of Plaintiff's

19

testimonial evidence was supported by substantial evidence, or whether he conducted a proper analysis of the relevant factors in determining the Plaintiff's credibility.

## C.  Harmless Error

The ALJ's failure throughout his decision to provide adequate reasons and point to specific evidence in his analysis is not harmless error.  Failure of an ALJ to strictly follow a review requirement will constitute "harmless error if the ALJ has 'met the goals of the procedural requirement – to ensure adequacy of review and to permit the claimant to understand the disposition of his case – even though he failed to comply with the regulations terms.'" *Karger  v. Comm'r of Soc. Sec., 414 Fed. Appx. 739, 753 (6th Cir. 2011) (citing Coldiron v. Comm'r of Soc. Sec., 391 Fed. Appx 435, 440 (6th Cir. 2010)* (citing *Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 547 (6th Cir. 2004)*)).  "An ALJ may accomplish the goals of this procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record." *Id.*  (*citing, inter alia, Hall v. Comm'r of Soc. Sec.,  148 F. App'x 456, 464-65 (6th Cir. 2005)*).  "Notably, courts look to the ALJ's decision itself, and not other evidence in the record, for support." *Id.*  In other words, the requisite evidence and analysis must appear in the ALJ's decision, not simply be present in the rest of the record.[2]

In both her brief and reply brief, Plaintiff points to some evidence, both medical and non-medical, that is relevant to the domain analysis.  Due to the ALJ's deficient explanations, it is unclear *anywhere* in his decision whether this evidence was properly weighed and/or discredited.

---

[2] The undersigned acknowledges that the Commissioner points to some evidence on the record that would support the findings of the ALJ.  However, the decision itself does not contain sufficient analysis so as to allow the Court to determine that the Commissioner's argument followed the reasoning of the ALJ.  It is improper for the Court to affirm the ALJ's decision based upon a *post hoc* rationalization submitted by the Commissioner in an effort to supplement the ALJ's deficient analysis.  *See Simpson v. Comm'r of Soc. Sec., 344 F. App'x 181, 192 (6th Cir. 2009)*; *Martinez v. Comm'r of Soc. Sec., 692 F. Supp. 2d 822, 826 (N.D. Ohio 2010)*.

For instance, Plaintiff points to academic assessment evidence that could support a finding that his ADHD and disruptive behavior disorders are becoming more severe, and should be considered in the domain of Attending and Completing Tasks.     Under the Interacting and Relating domain, as well as that of Attending and Completing Tasks, Plaintiff alleges that evidence and testimony relating to N.K.D.'s difficulties with speech were not properly addressed.  Plaintiff argues her testimony that N.K.D. still requires oversight when using the bathroom should reasonably be considered under the domain of N.K.D.'s ability to care for himself.  Further, Plaintiff points to evidence involving N.K.D.'s asthma, dental issues, and ongoing need for corrective eye surgery as properly reviewable under the domain of Health and Well-being. Because this evidence could support, along with other evidence on the record, a favorable finding for Plaintiff under the domain analysis, and the decision is insufficient to establish that this evidence was properly analyzed and weighed by the ALJ, the harmless error rule will not save the decision from remand.

D.  Medical Expert Testimony

Plaintiff also argues that remand is warranted due to the ALJ's failure to utilize a Medical Expert at the hearing.  The regulations give the ALJ discretion to ask for and consider opinions from experts on the issue of medical equivalency.  20 C.F.R. 404.1527(e)(2)(iii).  Social Security Ruling 96-6p also advises:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence of the evidence before the administrative law judge…must be received into the record as expert opinion evidence and given appropriate weight.

1996 WL 374180.   The signature of a state agency medical consultant on a Disability Determination and Transmittal Form ensures that consideration by a physician designated by the Commissioner has been given to the issue of medical equivalency at the initial and

reconsideration levels of administrative review.  *Id.*  Additional medical expert evidence is required under two circumstances, both of which are discretionary:  (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge…the case record suggest[s] that a judgment of equivalence may be reasonable"; or (2) "When additional medical evidence is received that in the opinion of the administrative law judge…may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity."  SSR 96-6p, 1996 WL 374180, at *4.  Plaintiff additionally points to HALLEX I-2-5-34, which suggests additional ME opinion may be appropriate to determine whether a claimant's impairments meet a listed impairment, when determining the degree of severity of the physical or mental impairment, or when the medical evidence is conflicting or confusing.  HALLEX I-2-5-34 (S.S.A.), 1994 WL 637370.

It is not necessary for the undersigned to make a full determination regarding this issue, because, on remand, the ALJ's evaluation of the evidence may impact his findings as to the necessity of further medical expert testimony.  *See Shea v. Astrue*, 11-CV-1076, 2012 WL 967088, at *11 (N.D. Ohio Feb. 13, 2012) (*citing Reynolds*, 424 Fed. App'x at 417).  Noting the discretionary nature of the decision to employ additional medical expert testimony, the Court nonetheless urges the ALJ to fully discuss why the hearing testimony, conflicting evidence, and evidence not presented to the state agency consultants does not require further medical expert opinion, should he so conclude.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case for further proceedings.

IT IS SO ORDERED.

s/ Kenneth S. McHargh

Kenneth S. McHargh

United States Magistrate Judge

Date: <u>December 2, 2015</u>